UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>(1)  MARCIALITO BIOL BENITEZ, )<br>    a/k/a "Mars," )<br>(2)  ENGILBERT ULAN, )<br>    a/k/a "Angel," )<br>(3)  NINO REYES VALMEO, )<br>(4)  HAROLD POQUITA, )<br>(5)  JUANITA PACSON, )<br>(6)  FELIPE CAPINDO DAVID, )<br>    a/k/a "Pilipi" or "Peebles," )<br>(7)  PETERSON SOUZA, )<br>(8)  DEVON HAMMER, )<br>(9)  TAMIA DUCKETT, )<br>(10) KARINA SANTOS, and )<br>(11) CASEY LOYA, )<br><br>           Defendants )<br> ) | Criminal No. 1:22-cr-  10077<br><br>Violation:<br><br>Count One: Conspiracy to Commit Marriage Fraud and Immigration Document Fraud (18 U.S.C. § 371)<br><br>Forfeiture Allegation:<br>(18 U.S.C. § 982(a)(6)) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1.     Defendant MARCIALITO BIOL BENITEZ, a/k/a "Mars" ("MARS"), was a Philippine national residing in Los Angeles, California.

2.     Between at least as early as October 2016 and in or about March 2022, MARS operated a marriage fraud "agency" that (i) arranged hundreds of sham marriages between foreign nationals and United States citizens—marriages entered into for the primary purpose of circumventing immigration laws; and (ii) submitted fraudulent petitions to United States Citizenship and Immigration Services ("USCIS") seeking to adjust the immigration status of the foreign nationals based on those sham marriages (the "Agency").

3.      Defendant ENGILBERT ULAN, a/k/a "Angel" ("ULAN"), was a Philippine national residing in Los Angeles, California.

4.      Defendant NINO REYES VALMEO ("VALMEO") was a Philippine national residing in Los Angeles, California.

5.      Defendant HAROLD POQUITA ("POQUITA") was a Philippine national residing in Los Angeles, California.

6.      Defendant JUANITA PACSON ("PACSON") was a Philippine national residing in Los Angeles, California.

7.      ULAN, VALMEO, POQUITA, and PACSON assisted MARS with operating the Agency.

8.      Defendant FELIPE CAPINDO DAVID, a/k/a "Peebles", a/k/a "Pilipi" ("DAVID"), was a Philippine national residing in Los Angeles, California.  DAVID partnered with MARS to arrange sham marriages for foreign nationals and to submit fraudulent immigration petitions to USCIS.

9.      Defendant PETERSON SOUZA ("SOUZA") was a Brazilian national residing in Anaheim, California.  SOUZA recruited foreign nationals looking to adjust their immigration status based on sham marriages through MARS and the Agency.

10.      Defendant DEVON HAMMER ("HAMMER") was an American citizen residing in Palmdale, California.

11.      Defendant TAMIA DUCKETT ("DUCKETT") was an American citizen residing in Lancaster, Inglewood, and Palmdale, California.

12.     Defendant KARINA SANTOS ("SANTOS") was an American citizen residing in Lancaster, California.

13.     Defendant CASEY LOYA ("LOYA") was an American citizen residing in Lancaster and Palmdale, California.

14.     HAMMER, DUCKETT, SANTOS, and LOYA recruited U.S. citizens to enter into sham marriages arranged by MARS and the Agency.

15.     Client 1 was a foreign national residing in Massachusetts.

16.     Client 2 was a foreign national residing in Los Angeles, California.

<u>Background on Immigration Procedures</u>

17.     USCIS is the government agency within the United States Department of Homeland Security that oversees lawful immigration to the United States, including immigration by foreign nationals seeking to apply for lawful permanent resident status (commonly known as applying for a "Green Card") and for United States citizenship.

18.     USCIS is responsible for deciding whether foreign national petitioners are eligible for lawful permanent resident status or United States citizenship.   As part of this process, USCIS reviews applications and petitions, conducts interviews, obtains and reviews supporting documentation, and approves or denies applications and petitions.

19.     A foreign national may obtain lawful permanent resident status, and ultimately United States citizenship, based upon a legitimate marriage to a United States citizen.   If a foreign national marries a United States citizen, the United States citizen may file a USCIS Form I-130, "Petition for Alien Relative" ("Form I-130"), with USCIS to obtain lawful status for the

foreign national, and the foreign national may simultaneously file a USCIS Form I-485,

"Application to Register Permanent Residence or Adjust Status" ("Form I-485").   The filing of a

Form I-130 authorizes the foreign national to remain in the United States until USCIS makes a

decision on the petition.

20.    If USCIS establishes that the marriage between the foreign national and the

United States citizen is legitimate, USCIS approves the citizen's Form I-130 and the foreign

national's corresponding Form I-485.

21.    Alternatively, under the Violence Against Women Act ("VAWA"), foreign

nationals may self-petition for a Green Card as the spouse of an abusive United States citizen or

lawful permanent resident, without the spouse filing a corresponding Form I-130.   VAWA

allows victims of abuse, regardless of their gender, to seek safety and independence from abusers

who otherwise control the abused spouse's ability to obtain lawful resident status in the United

States.   Petitioners for resident status under VAWA are required to submit USCIS Form I-360,

"Petition for Amerasian, Widow(er), or Special Immigrant" ("Form I-360"), along with

documentation of a legitimate, qualifying legal relationship to an abusive United States citizen or

lawful permanent resident and evidence of abuse committed by the citizen or lawful permanent

resident.

<u>Object and Purposes of the Conspiracy</u>

22.    The principal objects of the conspiracy were to commit marriage fraud and

immigration document fraud by, among other things, arranging sham marriages between foreign

nationals and United States citizens, and by preparing and submitting false petitions,

4

applications, and other documents to USCIS to substantiate the sham marriages and secure adjustment of status for foreign nationals.

23.     The principal purposes of the conspiracy were to enrich the defendants and to conceal the defendants' conduct from USCIS and other immigration and law enforcement authorities.

Manner and Means of the Conspiracy

24.     Among the manner and means by which the defendants and coconspirators known and unknown to the Grand Jury carried out the conspiracy were the following:

25.     MARS would conduct the Agency's business under the name of a temporary staffing agency that he ran, Career Ad Management, LLC, from offices at 3325 Wilshire Boulevard in Los Angeles, California ("3325 Wilshire").

26.     MARS, VALMEO, ULAN, POQUITA, and PACSON identified prospective foreign national "clients" ("Clients") for the Agency through referrals from prior Clients and by word of mouth.

27.     SOUZA, a former Client of MARS, would refer Clients to MARS.   Between in or about January and in or about December 2021, SOUZA referred to MARS at least twenty-five Clients, primarily from Brazil.   SOUZA would receive a commission, typically of around $2,000, for each of these referrals.

28.     DAVID would refer Clients to MARS for assistance with obtaining Green Cards through sham marriages.   Between in or about January and in or about December 2021, DAVID referred to MARS at least six Clients, primarily from the Philippines.

29.     MARS, ULAN, VALMEO, POQUITO, PACSON, and others would hold introductory meetings with Clients at 3325 Wilshire and elsewhere to explain the scheme. MARS would charge Clients at least $20,000 to $30,000, which Clients paid in cash to MARS, MARS's associates, and United States citizens willing to enter into sham marriages with Clients for payments ("Spouses").

30.     MARS would provide Clients with payments schedules that detailed both upfront payments, for the marriage ceremony and the filing of immigration documents, and ongoing, monthly payments to the Spouse, in order to keep the Spouse responsive and cooperative until the Client obtained full lawful permanent resident status.

31.     MARS would use "brokers," including HAMMER, DUCKETT, SANTOS, and LOYA, among others, to recruit Spouses.

    a.   Between in or around October 2020 and in or around December 2021, HAMMER recruited at least ninety-four Spouses.

    b.   Between in or around October 2020 and in or around December 2021, DUCKETT recruited at least fifty-six Spouses.

    c.   Between in or around October 2020 and in or around December 2021, SANTOS recruited at least twenty-seven Spouses.

    d.   Between in or around October 2020 and in or around December 2021, LOYA, a former Client of MARS, recruited at least sixteen Spouses.

32.     Upon MARS's request and on their own initiative, HAMMER, DUCKETT, SANTOS, LOYA, and other brokers would send MARS photographs of prospective Spouses and their ages.

33.     MARS, HAMMER, DUCKETT, SANTOS, LOYA, and other brokers would gather images of prospective Spouses' personal documents, including their birth certificates, Social Security cards, and driver's licenses.   For Spouses who did not have their birth certificates, the brokers and/or MARS's staff would order new birth certificates.   MARS would use this information on fraudulent marriage and immigration documents that he and his staff prepared.

34.     HAMMER, DUCKETT, SANTOS, LOYA, and other brokers would send MARS prospective Spouses' employment information, including the names of their employers, job titles, and income.   MARS would use this information to prepare false tax returns for the prospective Spouses, which MARS would share with Clients and submit to USCIS with the petitions he and his staff prepared.

35.     MARS would inflate the job titles and incomes of the Spouses to ensure that they appeared to USCIS to have sufficient means to support the Clients (as required by law), and to make the Spouses more appealing to his Clients.

36.     Once MARS identified one or more potential Spouses for a Client, MARS would present the Client with the prospective Spouse and arrange meetings to assess whether the Client and the Spouse were a "good fit"—*i.e.*, that their marriage would not raise suspicions with UCSIS.

37.     Once Clients agreed to marry Spouses, at MARS's direction, HAMMER, DUCKETT, SANTOS, LOYA, and other brokers would prepare the Spouses for marriage to MARS's Clients.   The brokers would take Spouses to clothing stores to select suitable outfits for wedding ceremonies, including dresses that appeared similar to traditional wedding dresses. MARS would also command the brokers to ensure that Spouses were not under the influence of drugs on the dates of meetings and/or wedding ceremonies.

38.     MARS and his staff would stage fake wedding ceremonies at wedding chapels and other locations.   MARS, POQUITA, ULAN, VALMEO, and PACSON would book ceremony appointments at wedding chapels that did not inquire about whether marriages were fake, including one at which PACSON worked part-time.   MARS and associates would engage online wedding officiants to perform the ceremonies and would take photographs to document the ceremonies.   For many clients, MARS, POQUITA, and others would take photographs of Clients and their Spouses in front of prop wedding decorations.

39.     After conducting marriage ceremonies and completing official marriage documents, MARS, with the help of POQUITA, ULAN, VALMEO, PACSON, and others, would prepare and submit to USCIS, by mail and otherwise, fraudulent petitions seeking resident status and supporting documentation on behalf of Clients.

40.     To avoid USCIS scrutiny of himself, his coconspirators, and the Agency, MARS would not list himself or his staff as the preparers of these applications.

41.     For Clients who lived outside of California but needed to show residency there, MARS would arrange for the Clients to "rent" the physical addresses and mailboxes of his staff,

including VALMEO, ULAN, and PACSON.   VALMEO, ULAN, and PACSON would receive

payments from Clients for the use of their addresses on USCIS and related documents.

42.     MARS and his staff would advise Clients about maintaining the appearance of

legitimate marriage to their Spouses.   MARS, POQUITA, ULAN, and others would assist

Clients with opening joint bank accounts with their Spouses; registering vehicles and purchasing

life insurance policies with them; and filing taxes jointly.   MARS and staff also would advise

Clients to meet with their Spouses regularly and to take photographs with them and their

Spouses' families.   MARS and his staff would also take photographs of Clients and their

Spouses in front of artwork on display at 3325 Wilshire, to create photographic evidence of the

Clients and Spouses being together.

43.     MARS and associates would assist Clients with obtaining U.S. Employment

Authorization cards and Social Security cards.

44.     MARS, ULAN, and others would hold coaching sessions to prepare Clients and

Spouses for interviews with USCIS.   During coaching sessions, MARS and associates would

use written lists of practice questions.   One such list explained that "the main objective is to

prove that the marriage is genuinely true" and instructed that "[c]ouples/spouses should show

GOOD CHEMISTRY during the interview."

45.     MARS, HAMMER, DUCKETT, SANTOS, LOYA, and others addressed

problems with unresponsive or uncooperative Spouses.   For example, MARS would direct the

brokers to persuade Spouses to remove posts on social media that revealed information about the

Spouses' actual domestic partners and families.   MARS would also ask the brokers to contact

Spouses who had stopped responding to MARS's Clients and to mediate disputes over payments from the Clients to the Spouses.

46.     MARS and his staff would prepare and submit additional documentation that USCIS requested for MARS's Clients during the petition approval process.

47.     PACSON and ULAN would notarize fraudulent affidavits in support of immigration petitions.

48.     MARS, DAVID, VALMEO, and others would assist certain Clients with obtaining Green Cards under VAWA, through the submission of fraudulent Forms I-360, typically when their Spouses stopped responding or became unavailable to follow through with the immigration interview(s) with USCIS.

49.     For Clients seeking a Green Card under VAWA, MARS and associates would make fraudulent applications for temporary restraining orders ("TROs") in Los Angeles Superior Court based on alleged domestic violence by the Spouses.   MARS and associates would then provide the TRO documentation with Forms I-360 that they submitted to USCIS.

50.     MARS and associates would also fabricate, and have individuals sign, affidavits that attested to the legitimacy of the marriage between the Client and the Spouse and described abuse of the Client by the Spouse.   MARS and associates would submit these affidavits to USCIS.

51.     In this fashion, MARS, ULAN, VALMEO, POQUITA, PACSON, DAVID, SOUZA, HAMMER, DUCKETT, SANTOS, LOYA, and others arranged marriages and submitted fraudulent immigration documents for at least 400 Clients between in or about October

2016 and in or about March 2022, generating at least $8 million in proceeds to MARS, associates, and Spouses through the scheme.

Acts in Furtherance of the Conspiracy

52.      On various dates between at least as early as in or about October 2016 and in or about March 2022, MARS, ULAN, VALMEO, POQUITA, PACSON, DAVID, SOUZA, HAMMER, DUCKETT, SANTOS, LOYA and others known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the conspiracy and the scheme to defraud.

*Client 1*

53.      On or about May 26, 2020, at 3325 Wilshire, MARS and POQUITA met with Client 1, who had been referred to MARS by a friend who had previously entered into a sham marriage through MARS.

54.      At the meeting, MARS showed Client 1 a list of names and photographs of male Spouses from whom Client 1 could select.

55.      Later that same day, MARS received from Client 1 text messages that included images of Client 1's passport and visa.

56.      On or about May 27, 2020, at 3325 Wilshire, MARS introduced Client 1 to a prospective Spouse, whom DUCKETT had recruited and brought to the meeting.

57.      At the meeting, MARS provided Client 1 with a "Package Plan" that required an upfront payment of $18,000, "payable to agent," and a balance of $10,000 owed to her Spouse in monthly payments of $350 for approximately 30 months following the marriage ceremony.

11

58.     On or about the same day, MARS sent an email to the wedding chapel where PACSON worked, copying PACSON's email address, and attached a completed marriage license application as well as images of Client 1 and her Spouse's driver's licenses.

59.     On or about May 28, 2020, MARS, DUCKETT, and associates arranged a wedding ceremony for Client 1 and her Spouse at a park.

60.     POQUITA took photographs at the ceremony.

61.     Following Client 1's wedding ceremony, MARS had Client 1 sign immigration documents that MARS and POQUITA had prepared, which falsely listed Client 1 as the preparer.

62.     On or about May 29, 2021, MARS instructed Client 1 to list ULAN's address on immigration and other official documents, and to pay ULAN $100 monthly for the use of his address.

63.     On or about May 29, 2021, ULAN contacted Client 1 with Zelle instructions for the address rental payments.

64.     On or about that same date, ULAN began receiving monthly payments of $100 from Client 1.

65.     On or about June 2, 2020, Client 1 contacted MARS to complain about her new Spouse's requests for earlier payments and his posts on Facebook, which Client 1 worried would alert authorities to the fraudulent nature of their marriage.

66.     On or about the same day, DUCKETT called Client 1's Spouse to discuss his request to change the payment schedule and to instruct him to change his posts on Facebook.

67.     In or around July 2020, MARS advised Client 1 to register a car in her and her Spouse's names at ULAN's address.

68.     On or about October 24, 2020, MARS obtained an Employment Authorization card and a Social Security card for Client 1, which had been mailed to ULAN's address, and mailed both cards to Client 1's real address in Massachusetts.

69.     On or about March 10, 2021, ULAN met with Client 1 at 3325 Wilshire to review documents in advance of Client 1's immigration interview.

70.     On or about March 10, 2021, ULAN prepared a fraudulent joint tax return for Client 1 and her Spouse to use as part of the scheme.

71.     On or about the same day, ULAN advised Client 1, "Everything should be addressed in the address where you both live which is my address[.]"

72.     On or about March 23, 2021, after receiving messages from Client 1 indicating that her Spouse was not willing to prepare for the interview with USCIS, MARS advised Client 1: "Bribe him u give extra bonus if u get your greencard.   That's a technique sometimes like 300 or 500."

73.     On or around March 25, 2021, following the USCIS interview, after Client 1 messaged MARS that USCIS had requested additional evidence of Client 1's marriage to her Spouse, MARS advised Client 1 to withhold payments to the Spouse unless the Spouse agreed to allow Client 1 to take photographs with the Spouse's family.

74.     On or around March 26, 2021, MARS sent Client 1 two affidavits, signed by individuals that Client 1 did not know, that falsely stated that Client 1 and her Spouse were legitimately married and lived together at ULAN's address.

75.     On or around April 23, 2021, MARS notified Client 1 that USCIS had approved her Green Card.

*Client 2*

76.     In or around December 2020, VALMEO told Client 2, a 53-year-old man, that VALMEO could help to adjust Client 2's immigration status through marriage in exchange for $30,000.

77.     VALMEO instructed Client 2 to bring $15,000 to a meeting at 3325 Wilshire on January 5, 2021 and explained that this amount would be split between the Spouse and the broker who recruited her.

78.     Prior to the scheduled meeting, on or about January 5, 2021, MARS messaged HAMMER: "Devon, find me a girl[.] like matches to 53 male guy . wanna meet at 5:30pm and marriage tomorrow morning.. Need a girl age from 30-45 youif u have[.]"

79.     On or about the same day, in response, HAMMER identified a potential Spouse for MARS to introduce to Client 2.

80.     Later that same day, MARS messaged HAMMER, "[citizen's name] – single, single , no kids , warehouse manager for 10yrs ams corporation in valencia , making 56k a year or 30 dollars per hr[.] thats the info i gave to client[…] dress her elegantly so we close the deal[.]"

81.     Shortly thereafter, HAMMER messaged MARS with the Spouse's Social Security number and a photograph of the Spouse's driver's license.

82.     Later that same day, MARS and VALMEO met with Client 2 at 3325 Wilshire.

83.     At this meeting, HAMMER introduced the prospective Spouse to Client 2, and MARS showed Client 2 income tax returns for the prospective Spouse and a background check purportedly conducted on her.

84.     On or about the following day, January 6, 2021, MARS and associates arranged a wedding ceremony for Client 2 and the Spouse at a wedding chapel and received $15,000 in cash from Client 2.

85.     Following the wedding ceremony, MARS and his staff presented Client 2 with immigration documents that they had prepared, instructed Client 2 to sign the documents, and provided Client 2 with a pre-filled envelope that Client 2 used to mail the immigration documents, which USCIS received on or about January 19, 2021.

86.     On or about January 16, 2021, MARS messaged HAMMER: "devon pls discuss with your client [name] about what shes getting pls do not involve my client [name] .. what she gets its between u and her . she should not deal with my client . ok pls clarify . she said she was only getting 1700 and its unfair[.]"

87.     On or about January 26, 2021, MARS forwarded to HAMMER a long message that Client 2's Spouse had sent to Client 2, in which the Spouse apologized to Client 2 and explained that she did not work in Valencia or make $30 an hour and that she and her son were homeless and living in a motel.

88.     MARS then messaged HAMMER: "devon can u pls fix your client[?] she been destroying the business at all[.] now everybody in the filipino community will know that we pick up homeless people[.]"

89.     Shortly before Citizen 2 and his Spouse's interview with USCIS on or about June 29, 2021, ULAN conducted a practice interview session with Client 2 and his Spouse.

90.     On or about July 1, 2021, after the Spouse signed a sworn statement at the interview with USCIS admitting that she had been paid $1,700 on January 6, 2021 to enter into an arranged marriage with Client 2, MARS messaged Client 2: "dont give any single cent of that [Spouse's name] anymore […] i told the broker about the mess she did […] dont pay anything […] she messed up everything[.]"

91.     The same day, MARS advised Client 2 to file for a restraining order against the Spouse after Client 2 told him that the Spouse had been threatening him for payment.

*Other Acts*

92.     On or about July 5, 2019, MARS sent to a Client an email with the subject "QUESTIONS" and three attachments containing practice interview questions.   The first of these attachments was a list of 211 "possible questions" that included, "Who sleeps on the right side of the bed?" and "What is the color of your spouse's toothbrush?"   This list concluded with the hypothetical questions: "How much did you pay for your spouse in this marriage?" and "Is there someone helping you?"

93.     On or about October 28, 2020, ahead of a fraudulent wedding between a Client and a Spouse that LOYA recruited, LOYA messaged MARS, "I won't be making the meet and greet […] But my client is prepared and ready to go has his wedding clothes[.]"

94.     LOYA directed the prospective Spouse to meet at MARS's office and messaged MARS, "He is with his sister she may want to do it too check if she's pretty[.]"

95.     LOYA then met MARS at a wedding chapel for the ceremony with LOYA's recruit and MARS's Client.

96.     On or about October 29, 2020, when LOYA informed MARS that a potential Spouse was a receptionist at a construction company, MARS responded, "we can inform shes sales and marketing in construction[.]" and that "receptionist is a minimum job cant petition[.]"

97.     On or about the same day, when MARS sent LOYA a fraudulent Form W-2, Wage and Tax Statement with wage information for the Spouse that MARS made up, LOYA responded, "Dammmm ur good[.]   Lol[,] I'll brief her[.]"

98.     On or about November 5, 2020, after learning from HAMMER that a potential Spouse was a "waitress/bartender at [restaurant name]" and earned $28 an hour, MARS informed HAMMER that MARS would present the Spouse as a "restaurant manager" who earned $60,000 annually.

99.     On or about December 28, 2020, ahead of a meeting among MARS, SANTOS, a Client, and a prospective Spouse whom SANTOS recruited, MARS instructed SANTOS: "get a nice dress for her pls […] and her screen of her cell is her baby[,] make a different screen[.]"

100.    On or about the following day, after the first prospective Spouse informed SANTOS that she was no longer comfortable with proceeding with the planned marriage, SANTOS sent MARS the photograph, driver's license, birth certificate, and Social Security card of another prospective Spouse.

101.    On or about March 15, 2021, MARS messaged SOUZA, "i meet w brazilian I will ask them to contact u they want a papers and I said inknow a Brazilian who will screen u and discuss about the package […] looking for a citizen to marry […] and I told I know a brazilian broker who can help u […] I don't want the[m] to direct to me I want u to talk to them if they are trustworthy[.]"

102.    On or about the same day, SOUZA replied to MARS, "I ll talk to the[m] … and I ll let u know later … thanks for trust and me[.]"

103.    On or about the following day, SOUZA presented two potential Clients to MARS.

104.    On or about March 24, 2021, after SANTOS sent MARS the photograph and documents of a prospective Spouse, MARS messaged SANTOS that the Spouse previously "went to devon [HAMMER], tamia [DUCKETT]," married another Client, collected payments, and disappeared before the scheduled USCIS interview date.

105.    On or about April 26, 2021, in response to a Client who learned that her Spouse had been imprisoned, MARS advised the Client that she could submit a petition under VAWA: "its a self petition that you been abused and u have to provide evidence so you can get your own greencard."

106.    On or about April 28, 2021, after SANTOS informed MARS that a potential Spouse was a "ride operator" at a theme park, MARS informed SANTOS that MARS would present the Spouse as a "supervisor" at the theme park who earned $50,000 annually.

107.    In or around May 2021, SANTOS messaged MARS, "hey mars peebles [i.e., DAVID] told my client that he will pay more money to bring clients, way more than what you give us, why is that?"

108.    MARS replied, referring to DAVID's Clients, "tell your client they will ran away[.]   [O]nce they got theyre papers they [SANTOS's Spouses] have no protection" with respect to payments from DAVID's Clients.

109.    In or around June 2021, MARS messaged ULAN and POQUITA with the following practice questions: "How did your husband/wife transferred to your house[?]   What is your major purchase since you moved in together[?]   How many TVs[?]   Who do you spend Christmas with[?]"

110.    On or about June 27, 2021, HAMMER messaged MARS, "Mars wedding on a Sunday lets make some money lol[.]"

111.    On or about July 26, 2021, after learning that a friend of his had gotten married through MARS's Agency, SOUZA complained to MARS that "Brazilians always will try to talk[ ] to u directly and cut me [out]" so that MARS would charge them less without having to pay a broker for the Clients.

112.    On or about July 15, 2021, MARS emailed a Client two documents: one named "Proof of VAWA Requirements"—a list prepared by MARS of the various documentation

needed to submit a VAWA-based petition to USCIS—and an example of a "Psychosocial Evaluation" regarding another Client's claimed abuse by a Spouse.

113.     On or about September 2, 2021, MARS directed VALMEO to prepare a TRO application for the same Client, who filed the application in court.

114.     On or about November 17, 2021, MARS sent to this same Client three affidavits purporting to be signed by individuals who attested that the Client's Spouse was abusive to the Client.

115.     On or about November 18, 2021, MARS filed a Form I-360 petition under VAWA for this Client.

116.     On or about August 25, 2021, in response to questions from one of MARS's Clients, PACSON advised the Client to file taxes jointly with his Spouse because "One of the best documents that immigration officer is going to look is your both taxes."

117.     On or about November 2021, MARS directed SOUZA to bring a prospective Client to a Starbucks "near the chapel […] so if they agree wedding right away[.]"

118.     On or about that same day, MARS, SOUZA, the Client, HAMMER, and the prospective Spouse (whom HAMMER recruited) met at the Starbucks and then held a marriage ceremony at the nearby chapel.

119.     On or about November 15, 2021, MARS and DAVID met with a Client whom DAVID had referred to MARS and whose Spouse had since become uncooperative.

120.     On or around December 10, 2021, MARS e-filed a Form I-360 petition under VAWA for this Client.

<u>COUNT ONE</u>
Conspiracy to Commit Marriage Fraud and Immigration Document Fraud
(18 U.S.C. § 371)

The Grand Jury charges:

121.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-120 of this

Indictment.

122.    From at least as early as in or about October 2016 through in or about March 2022,

in California, in the District of Massachusetts, and elsewhere, the defendants,

| | |
|---|---|
| (1) | MARCIALITO BIOL BENITEZ, |
| (2) | ENGILBERT ULAN, |
| (3) | NINO REYES VALMEO, |
| (4) | HAROLD POQUITA, |
| (5) | JUANITA PACSON, |
| (6) | FELIPE CAPINDO DAVID, |
| (7) | PETERSON SOUZA, |
| (8) | DEVON HAMMER, |
| (9) | TAMIA DUCKETT, |
| (10) | KARINA SANTOS, and |
| (11) | CASEY LOYA, |

conspired with each other and with others known and unknown to the Grand Jury to commit

offenses against the United States, to wit:

a.    marriage fraud, that is, to enter into a marriage for the purpose of evading any

provision of the immigration laws of the United States, in violation of Title 8,

United States Code, Section 1325(c) and Title 18, United States Code, Section

2; and

b.    immigration document fraud, that is, to knowingly make under oath and

subscribe as true false statements with respect to material facts in applications,

affidavits, and other documents required by the immigration laws and

21

regulations prescribed thereunder, and knowingly present applications, affidavits, and other documents which contain such false statements, in violation of Title 18, United States Code, Sections 1546(a) and 2.

All in violation of Title 18, United States Code, Section 371.

FORFEITURE ALLEGATION
(18 U.S.C. § 982(a)(6))

123.    Upon conviction of the offense set forth in Count One, the defendants,

(1)    MARCIALITO BIOL BENITEZ,
(2)    ENGILBERT ULAN,
(3)    NINO REYES VALMEO,
(4)    HAROLD POQUITA,
(5)    JUANITA PACSON,
(6)    FELIPE CAPINDO DAVID,
(7)    PETERSON SOUZA,
(8)    DEVON HAMMER,
(9)    TAMIA DUCKETT,
(10)   KARINA SANTOS, and
(11)   CASEY LOYA,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(6), any

conveyance, including any vessel, vehicle, or aircraft, used in the commission of the offense; any

property, real or personal, that constitutes or is derived from or is traceable to the proceeds

obtained directly or indirectly from the commission of the offense; and any property, real or

personal, used to, or intended to be used to facilitate, the commission of the offense.

124.    If any of the property described in Paragraph 123, above, as being forfeitable

pursuant to Title 18, United States Code, Section 982(a)(6), as a result of any act or omission of

the defendants --

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without
    difficulty;

23

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendants up to the value of the property described in Paragraph 123 above.

All pursuant to Title 18, United States Code, Section 982(a)(6).


A TRUE BILL


_____
FOREPERSON


_____
DAVID M. HOLCOMB
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS


District of Massachusetts: April __4__, 2022
Returned into the District Court by the Grand Jurors and filed.


   /s/ Lisa Belpedio at 4:08 pm
DEPUTY CLERK

24